[Crim. No. 10448. Second Dist., Div. Two. Dec. 15, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. VERNON D. NERGER, Defendant and Appellant.

Hal Hughes and Chester S. Johnson for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

ROTH, P. J.—Appellant, a physician, was found guilty of violating sections 11163 and 11164 of the Health and Safety Code which involve dispensing narcotics for the purpose of narcotics addiction. The appeal is taken from the judgment of conviction and from the order denying a new trial. The appeal from the latter is dismissed (Pen. Code, § 1237, subd. 2; *People* v. *Eppers,* 205 Cal.App.2d 727, 728 [23 Cal.Rptr. 222].)

On January 20, 1964, state narcotics agents went to the vicinity of appellant's office with one John Perrier, a patient. Perrier was an addict and was being treated by appellant for liver and asthma ailments. Appellant testified that he knew of Perrier's addiction and supplied him with narcotics in initially large but later decreasing amounts in order to cure him.

On the occasion of January 20, Perrier was given state funds and went into appellant's office and returned with an ampule of clear fluid; the fluid was analyzed and at least one of the agents was notified of its contents but its nature is not revealed by the record.

On January 24, 1964, Agent Barry accompanied Perrier as far as the lobby of the appellant's office building and the procedure was repeated.

A few days later Agent Barry was introduced as "Jim" to appellant in the latter's office and purchased some pills for $5.00 a piece. At this time, Barry testified, he was not given a physical examination nor asked about his medical history. Neither did he alter his physical appearance in any way.[1] The pills were established as containing narcotics.

After this introductory meeting Agent Barry, posing as an addict, purchased narcotics from appellant at the latter's office on six other occasions. At no time did appellant ask for a medical history or perform a physical examination. Again, Barry testified that his physical appearance was unaltered.

---

[1] Appellant testified that Agent Barry appeared to be suffering from withdrawal symptoms, in that he shuffled his feet as he walked and was slightly stooped. We do not seek to resolve this conflict, since that is the function of the trier of fact.

On the fifth occasion appellant was told that the purchase was not for Agent Barry, but for a friend. Appellant sold Barry the pills for the "friend" without inquiring as to the latter's medical history or illness.

On the sixth occasion Agent Barry introduced Agent Cota as "Tony", the friend for whom he had made a previous purchase, although previously requested by appellant not to bring his friend to the office. Appellant sold narcotics to both men. During this meeting, Barry testified:

"I [Barry] said, 'Doc, Tony wouldn't believe the price when I told him.'

"Dr. Nerger stated, 'You know, Jim, it is outrageous. I am doing business with this Kike and the s.o.b. is letting me have the stuff at a high price. I am not making anything.'

"I then said, 'Boy, this guy sounds like a real score. How does he get away with it?'

"The doctor then said, 'You are right. There is a Federal order form in triplicates. The way I think he does it—the way this guy does it, he has been hit several times. When he reports the loss to the police, it is a lot more than he actually lost. So, the stuff he reports as having been taken, he lets me have it.' "

Agent Barry testified that "real score" in connection with narcotics enforcement means an abundant supply of narcotics and that "hit" refers to burglaries.

Thereafter, Agent Cota alone purchased narcotics from appellant at the latter's office. During this meeting Agent Cota testified to a conversation between appellant and himself through the playing of a tape recording, during the course of which much was said about the illicit source of appellant's narcotics.

On March 4, 1964, Agents Barry and Cota went to appellant's office, purchased some additional narcotics, and placed appellant under arrest. They were then joined by two additional state agents. Following the arrest, appellant was engaged in a conversation with the agents which lasted for approximately 20 minutes. At the end of this time, appellant made a request to call his attorney, which was granted. The conversation was brief. The agents told appellant to inform his attorney not to come to the office, but to meet them downtown since they were about to depart.

At this point, appellant was placed in a state vehicle and taken downtown to the state building. During the ride downtown, additional conversation was had with appellant.

The aforementioned conversations after arrest were recorded and played at trial.

Appellant's sole defense to the charges was entrapment. At trial, he took the stand, admitted selling narcotics to Agents Barry and Cota, but insisted that they had played upon his sympathies by feigning withdrawal symptoms and thus entrapped him into committing the crimes.

On cross-examination he was asked whether, at the time of arrest, he had made certain statements to the arresting agents, to which he answered that he did not recall.

Subsequently, on rebuttal, the prosecution introduced portions of the recorded conversations into evidence, the pertinent parts of which were as follows:

"Voice No. 1:[2] Do you have any medical history on me, Doctor?

"Voice No. 2: On you?

"Voice No. 1: Do you have a chart?

". . . . . . . . . . . .

"Voice No. 2: No.

"Voice No. 1: Medical records?

"Voice No. 2: No.

"Voice No. 1: For Mr. Tony Pacheco, Agent Cota?

"Voice No. 2: No.

". . . . . . . . . . .

"Voice No. 3: If you're interested in helping these people, why did you charge them so much money?

"Voice No. 2: I charged them exactly what I paid for this.

". . . . . . . . . . . .

"Voice No. 2: Addicts are sick people. They need help. And the only way you can do is help them. You know they are going to go out and get heroin and so on and so forth. That is why I was willing to try to help some of these people.

". . . . . . . . . . . .

"Voice No. 1: What did you do with 8,000 Dolophine tablets?[3]

---

[2] Voice No. 1 is Agent Barry; Voice No. 2 is appellant; Voice No. 3 is another state agent.

[3] Dolophine was established to be a narcotic contained in many of the pills sold to Agents Barry and Cota.

"Voice No. 2: I probably helped people with them.

". . . . . . . . . . . . .

"Voice No. 1: Then you told us these are the only two and now you are saying probably you helped more. This is what you are saying that you are helping people. Who were these people and how?

"Voice No. 2: These are the only two people that I have given anything to recently.

". . . . . . . . . . . . .

"Voice No. 1: So, say we do know the source and we know the times you have purchased there. We have got the dates that you purchased narcotics from them, and that is why I asked you if you state that you are helping people.

"Voice No. 2: I have helped some people, yes. I told you that."

After appellant's attorney was called and appellant was en route downtown, the following discussion occurred:

"Voice No. 1: How is it that you would answer it, because most doctors wouldn't treat addicts. In fact, doctors know it is illegal to treat them, so they won't.

"Voice No. 2: Yes.

"Voice No. 1: Why would they select you to come to?

"Voice No. 2: You treat one and they tell others how you can get it there. That is how they come in."

█ Appellant contends that it was reversible error to allow into evidence the conversations with appellant after arrest, citing *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

The record clearly demonstrates that at the time these statements were made to state agents, appellant had sought the aid of counsel; the investigation had focused on appellant who was in custody; and that a process of interrogation was being carried out which lent itself to eliciting incriminating statements. (*People* v. *Dorado, supra,* p. 353; *People* v. *Stewart,* 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) Appellant was not advised of his right to counsel or to remain silent.

█ The fact that appellant was allowed a brief telephone call to his attorney does not satisfy his right to counsel at the accusatory stage of the proceedings. Apparently, the only thing discussed with his attorney was where he was being

taken, and whether bail or a writ was needed to obtain a release from custody. As was said in *People* v. *Modesto,* 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753]: "It is immaterial that defendant was allowed to consult with his attorney several hours earlier and was advised that he could talk to the police if he wished and repeat the substantially less damaging admissions he had already made at that time. Escobedo had also discussed with his attorney what he should do in case of interrogation, but in this case as in the *Escobedo* case, there is no evidence that defendant was advised as to what he should or could do in the face of the continuing interrogation that took place."

In *People* v. *Stockman,* 63 Cal.2d 494 [47 Cal.Rptr. 365, 407 P.2d 277], the court makes it clear that ". . . an accused is entitled to receive sound legal advice as to how to respond *to each accusation as it arises"* in the course of interrogation. (*Id.* at p. 501.) ". . . [T]he accused would seem to be entitled to have counsel with him during interrogation unless he clearly and knowingly waives that right." (*Id.* at p. 501.) (See also *Escobedo* v. *Illinois,* 378 U.S. 478, 486 [84 S.Ct. 1758, 12 L.Ed.2d 977].)

 Whether the excerpted language made after appellant's arrest and during a period when he had a right to counsel was an admission or confession we need not determine. For it is no longer the law that the admission of a confession into evidence automatically requires reversal. In *People* v. *Furnish,* 63 Cal.2d 511, the court points out at p. 515 [47 Cal.Rptr. 387, 407 P.2d 299]: " The use of a confession obtained in violation of *Escobedo* or *Dorado,* like the use of a coerced confession, *generally* requires reversal ' "regardless of other evidence of guilt," ' " (italics added), citing *People* v. *Jacobson,* 63 Cal.2d 319, 329-330 [46 Cal. Rptr. 515, 405 P.2d 555]. In concluding that reversal was required, the court in *Furnish* stated that "The error in the admissions of such confessions is *clearly prejudicial."* (Italics added), again citing *for comparison People* v. *Jacobson, supra.*

In the *Jacobson* case a number of confessions of defendant were admitted, some of which were obtained under circumstances in which *Dorado* would apply, and some of which were legally obtained. The Supreme Court, admitting that in *Dorado* they had said: " 'These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in

evidence had no bearing on the results' '' went on to say: "Nevertheless, on this record we do have a 'rare case' in which a refusal to inquire into the impact, if any, of the confession on the verdict would result in complete abandonment of article VI, section 4½, of the California Constitution." (*People* v. *Jacobson*, 63 Cal.2d 319, 329-330 [46 Cal.Rptr. 515, 405 P.2d 555]; see also *People* v. *Cotter*, 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862]; *People* v. *Janssen, ante,* pp. 106, 109-111 [47 Cal.Rptr. 453].)

We see no significant difference in effect on the jury between a properly admissible extrajudicial confession, as in *Jacobson,* and an admission of guilt on the witness stand, as in the case at bench, where the latter is voluntary and not required by the admission of the illegally obtained confession.

In the *Stockman* case, *supra,* it was argued that the admission of the confession was nonprejudicial because the defendants put the same facts in evidence as part of their defense. The court did not agree, answering that ". . . where appellants are clearly impelled by the prior admission of illegally obtained evidence to put in evidence, the defense evidence cannot be held to have made the improperly admitted evidence nonprejudicial. (*Fahy* v. *Connecticut,* 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171]; *People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557]; *People* v. *Davis,* 62 Cal.2d 791, 796 [44 Cal.Rptr. 454, 402 P.2d 142]; *People* v. *Hill,* 233 Cal. App.2d 611, 614-615 [43 Cal.Rptr. 840].)'' (*People* v. *Stockman, supra,* at p. 502-503; see also *People* v. *Luker,* 63 Cal.2d 464, 479 [47 Cal.Rptr. 209, 407 P.2d 9].)

We cannot say in the present case that the appellant was "clearly impelled by the prior admission of illegally obtained evidence to put in evidence." On the contrary, appellant at no time denied the illegal sales of narcotics, but depended solely on the defense of entrapment.[4] He took the stand and admitted the commission of the crime *before* the admission of the disputed evidence. The statements made during that period when the right to counsel existed were introduced

---

[4]It is to be noted that trial in this case was held prior to the decision in *People* v. *Perez,* 62 Cal.2d 769 [44 Cal.Rptr. 326, 401 P.2d 934], in which it was decided that a defendant need not admit guilt to raise the defense of entrapment. At the time of trial appellant had to admit the commission of the crime in order to raise this defense. In view of the abundant evidence of appellant's guilt, other than statements made to the state agents at the time of arrest, appellant made a tactical decision to admit guilt and raise the issue of entrapment rather than indulge in a futile denial of the illegal sales.

only on rebuttal, after proper foundation had been laid, and were designed to destroy appellant's defense of entrapment.

At no time in the proceedings was appellant's commission of the illegal sales disputed. At trial there was abundant credible evidence of the crime omitting the conversation with the agents after arrest and without appellant's own testimony. Consequently, we hold the admission of the statements made and recorded in violation of appellant's right to counsel was not prejudicial insofar as they relate to the actual commission of the crime for which appellant is charged.

Insofar as the disputed evidence strikes at appellant's defense of entrapment, it is of course only an admission, and is subject to the prejudicial error rule. (*People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

In view of the credible evidence of Agents Barry and Cota that they did not feign withdrawal symptoms to play upon the sympathies of appellant, and the properly admitted evidence in which appellant discussed the illicit sources of his narcotics, we find that the admission of the evidence in question was not prejudicial.

We have examined appellant's other contentions and find them to be unmeritorious.

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 9, 1966.